IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHNNY RAY HUNLEY, JR.,

                    Plaintiff,                OPINION AND ORDER

    v.

                                           24-cv-22-wmc

NICOLE PARR,
GUNNER LEE,
JUSTIN RIBAULT,
ERIN WEHRLE, and
SARAH MARTIN,

                    Defendants,

---

Plaintiff Johnny Ray Hunley, Jr., a state prisoner representing himself, has been granted leave to proceed on claims of deliberate indifference under the Eighth Amendment as well as a claim of medical negligence under Wisconsin law. Specifically, plaintiff contends that: (1) all defendants were deliberately indifferent and negligent by failing to schedule timely a CT scan ordered by an outside provider; and (2) two defendants, Dr. Justin Ribault and Nurse Erin Wehrle, persisted in treatment they knew to be ineffective. (Dkt. #15.) Pending before the court are: defendants' opposed motion for summary judgment (dkt. #30); plaintiff's motion for the court to take judicial notice of adjudicative facts (dkt. #43); and defendants' unopposed motion to strike plaintiff's reply in support of his additional proposed findings of fact (dkt. #59). For the following reasons, the court will grant defendants' motions and deny plaintiff's motion.

BACKGROUND[1]

## A. The Parties

At all relevant times, plaintiff Johnny Hunley was in custody of the Wisconsin Department of Corrections ("DOC"). In January 2023, Hunley was assigned to the Wisconsin Secure Program Facility ("WSPF"), where all defendants were then employed.

More specifically, defendant Dr. Justin Ribault was employed as a physician. In this role, Dr. Ribault attended to inmate medical needs, such as diagnosing and treating illnesses and injuries, as well as arranging off-site consultations. When inmates are sent to an off-site provider, they return with an "off-site service request and report" allowing those providers to fill out a "recommended plan of care." (Dkt. #35, at ¶ 11-16.) Health Services Unit ("HSU") staff review those recommendations with inmates and advise them that their Advanced Care Provider ("ACP") will place any orders for such recommended care as is deemed appropriate. (*Id.*)

In WSPF's HSU, defendant Erin Wehrle was also employed as a Nurse Clinician 2; defendant Nicole Parr was employed as a Health Services Manager ("HSM"); and defendant Gunner Lee was employed as an Assistant Health Services Manager ("AHSM").

---

[1] Plaintiff asks this court to take "judicial notice of adjudicative facts of documentary evidence" submitted as exhibits to his proposed findings of fact and in his response to defendants' proposed findings of fact. (Dkt. #43, at 1.) However, because these exhibits are part of the record already, the court need not take judicial notice. Accordingly, his motion will be denied as moot. Additionally, plaintiff conceded that his reply to defendants' response to his proposed finding of fact was not authorized by this court's standard procedures and that the court may strike it from the record. (Dkt. #61.) The court will do so by granting defendants' motion to strike. Accordingly, unless otherwise indicated, the following facts are material and undisputed as drawn from defendants' reply to plaintiff's response to their proposed findings of fact (dkt. #50) and defendants' response to plaintiff's proposed finding of fact (dkt. #51).

In those roles, defendants Wehrle, Parr, and Lee were Hunley's first point of contact for medical issues and would work to resolve symptoms that did not require urgent evaluation from an ACP.  Generally speaking, all HSU staff work to find solutions through education and over-the-counter medications, which they may distribute by following nursing protocols established by DOC's Bureau of Health Services.  However, nursing staff may not prescribe medications, refer patients to off-site specialists, order imaging studies, or override an ACP's treatment decisions.

Finally, defendant Sarah Martin was employed as a Medical Program Assistant Associate ("MPAA").  In this role, Martin only scheduled appointments and could not determine a course of treatment.

### B.  Plaintiff's Care

On October 26, 2022, Hunley was seen for a physical by an Advanced Practice Nurse Prescriber ("APNP"), Jodi Fields, who is not a defendant.  Hunley reported to Fields that he had been drinking minimal water during the day and previously had been on a medication for urinary hesitancy and a weak stream, although he denied pain or burning. Fields noted that a urinalysis test taken on October 3 revealed microscopic hematuria (i.e., trace amounts of blood in his urine).  In response, Fields encouraged Hunley to increase his water intake and ordered a pelvic ultrasound, as well as another urinalysis.

On December 8, 2022, APNP Fields saw Hunley for a follow up.  While Hunley's most recent urinalysis had come back "normal" (meaning without microscopic hematuria), his ultrasound showed a mildly enlarged prostate.  As a result, Fields prescribed Hunley tamsulosin, a long-term medication prescribed to relax the prostate, which improves urine

flow and reduces urgency, frequency, and the feeling of incomplete emptying associated with an enlarged prostate. Fields also noted that Hunley may need a urology consultation if his symptoms continued.

However, on January 23, 2023, Hunley was transferred to WSPF. The very next day, Nurse Wehrle saw Hunley in that institution's HSU to address his complaint that his symptoms worsened after he began taking tamsulosin. After a urinalysis was completed and shown to be within normal limits, Nurse Wehrle encouraged Hunley to drink fluids and continue his medications. Wehrle also informed him that an ACP would be updated on his condition. After that appointment, Nurse Wehrle promptly updated Dr. Ribault, who noted that neither Hunley's previous pelvic ultrasound nor his most recent urinalysis explained his symptoms. Dr. Ribault also told Nurse Wehrle that if Hunley was not seeing obvious changes with tamsulosin he could stop taking it. Still, because Hunley's urinalysis came back normal, and because his symptoms were not accompanied by fever, chills, flank pain, nausea or vomiting, Dr. Ribault was unconcerned that Hunley was experiencing an urgent or emergent issue.

On February 10, two nurses, Wehrle and non-defendant Kaitlin Kinyon, saw Hunley in WSPF's HSU where he now reported that tamsulosin was helping with urinary retention, but he was still experiencing pain in his testicles and had a red, swollen urethra. After Nurses Wehrle and Kinyon obtained a urine sample, which was normal, they advised Hunley that his ACP would again be updated. In addition, Nurse Wehrle ordered acetaminophen and Motrin for Hunley's pain.

On February 20, Dr. Ribault saw Hunley for the first time. Hunley advised that

tamsulosin was helping with some of his urinary symptoms, and Dr. Ribault advised him to continue taking it.  Dr. Ribault further noted that Hunley's lab tests were normal, but because Hunley's issues were not resolving on their own, he ordered a urology consultation.  On February 23, a non-defendant nurse, Anna Fernberg, also saw Hunley in the HSU following his request for antibiotics to address his urinary complaints.  However, Nurse Fernberg advised that an ACP would not prescribe antibiotics without knowing or suspecting that Hunley had a bacterial infection.

A month later, on March 27, Hunley was seen by Dr. Hoxie, a non-defendant ACP, at an off-site urology clinic.  At that appointment, Hunley reported having issues with dysuria (pain, burning, or discomfort with urination) for the last three years.  He also reported a history of microscopic hematuria and an enlarged prostate, which tamsulosin had not helped, but denied having blood in his urine, nor significant urgency or frequency in urination.  In his notes, Dr. Hoxie wrote, "At this point I going to obtain a CT scan with and without IV contrast due to the microscopic hematuria" and that he "Will have [Hunley] follow up for a cystoscopy to make sure that intravesical abnormalities are present which could be causing his symptoms."  (Dkt. #33-1, at 96.)  In Dr. Hoxie's "recommended plan of care" section of Hunley's off-site service request and report, Dr. Hoxie also wrote "follow up for cystoscopy" noting further that "imaging will call to have CT set-up."  (*Id.*, at 95-96.)

When Hunley returned to WSPF, he reviewed this off-site service request and report with HSU staff, who forwarded it to Dr. Ribault.  On March 28, Dr. Ribault ordered the cystoscopy though not a CT scan, believing the latter was unnecessary since Hunley's lab

5

tests had been negative for microscopic hematuria since October 2022.  Later that same day, MPAA Martin scheduled the cystoscopy for May 15.

On April 18, Hunley sent two HSRs inquiring about scheduling of his urology tests. Nurse Wehrle reviewed both and responded that he had a scheduled appointment with urology for a cystoscopy.  On May 9, Hunley submitted another HSR and was told the appointment was soon.  Then on May 11, MPAA Martin received a call from the provider, stating that Hunley needed a CT before they could perform a cystoscopy.  Although Martin inquired about the possibility for Hunley to add a trip for a CT *before* the still scheduled cystoscopy on May 15, security was unable to do so because of staffing issues, and without the CT scan, the off-site medical facility decided that it was necessary to reschedule the cystoscopy.  At that point, Martin informed Dr. Ribault that Hunley needed to have a CT scan before his cystoscopy.  The next day, Dr. Ribault ordered the CT scan, and Martin scheduled both appointments.

On June 9, Hunley was seen off-site for his CT scan, which disclosed simple cysts in his kidneys.  These cysts are common, asymptomatic, and harmless fluid-filled sacs that rarely require intervention and would not have caused Hunley's symptoms.  Ten days later, on June 19, Hunley was again seen off-site for his cystoscopy.  Upon arriving at the off-site facility, however, Hunley was informed that his appointment would need to be rescheduled once again, this time due to equipment issues.  MPAA Martin rescheduled Hunley's cystoscopy appointment for the next available date and time, which unfortunately was not until August 21.  On June 23, Hunley was again seen in the HSU for urinary complaints. He was offered acetaminophen and ibuprofen for the pain but declined, stating that these

6

medications made his symptoms worse.

A month later, on July 25, another non-defendant WSPF physician, Dr. Degiovanni, saw Hunley for a follow up on his pelvic CT results.  At this visit, Hunley reported that his pain had become "unbearable" and that taking acetaminophen or ibuprofen caused a greater burning sensation.  In response, Dr. Degiovanni ordered a comprehensive metabolic panel and a prostate-specific antigen (PSA) test.  On July 31, Hunley was also seen by AHSM Lee for his urological concerns.  During that appointment, Lee emphasized that multiple recent urinalysis dips showed no signs of infection or blood, reviewed Hunley's chart and his recent and upcoming labs, and ordered a urinalysis, which returned normal results.  On August 14, Dr. Degiovanni further sent Hunley a letter explaining that his recent PSA test had returned normal results, meaning he had tested negative for prostate cancer, prostatitis, gonorrhea, and chlamydia.  Then, on August 21, Hunley was seen by an off-site urology provider for his delayed cystoscopy.  However, that provider found neither structural abnormalities in Hunley's bladder or urethra nor evidence of trabeculation, erythema, or inflammation.

On November 20, Hunley was again seen by an off-site urology provider for his complaints of urinary pain.  At this appointment, the provider took an ultrasound of Hunley's scrotum, which found small cysts and an enlarged right varicocele vein.  Again, however, neither finding required follow-up care, as these cysts were benign and often come and go throughout a patient's lifetime.  In particular, because his cystoscopy was negative, neither finding prompted the provider to believe Hunley required further evaluation or treatment.

Finally, on December 7, almost eleven months since Hunley's transfer to WSPF, Dr. Degiovanni reviewed Hunley's urology report. Because other issues had been ruled out, Dr. Degiovanni noted that Hunley may have a non-infectious inflammatory syndrome or chronic pelvic pain syndrome, then started him on a trial of amitriptyline. However, these syndromes are ordinarily diagnosed through exclusion, requiring other potential conditions to be tested for and ruled out.

OPINION

In this suit, plaintiff claims that defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Specifically, plaintiff contends that: (1) all defendants failed to schedule a CT scan timely; (2) Dr. Ribault encouraged him to take medicine that he knew would be ineffective; and (3) Dr. Ribault and Nurse Wehrle instructed him to take medicine that would actually worsen his condition. Defendants have moved for summary judgment, arguing that all of plaintiff's claims fail because he cannot meet the exacting, deliberate-indifference standard *or* demonstrate that he suffered actual harm. In the alternative, defendants assert entitlement to qualified immunity.

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If that initial burden is met, then the non-moving party must show that material, disputed issues of fact

8

exist, preventing the entry of summary judgment. *Id.*

Moreover, "[t]he nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087-88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

While pro se litigants are entitled to liberal construction of their pleadings, that "status doesn't alleviate his burden on summary judgment," meaning plaintiff has the burden to come forward with *evidence* that demonstrates a genuine issue of material fact. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) (citation omitted). Further, while the court must view the record "in the light most favorable to the nonmovant and constru[e] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere "speculation or conjecture." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

Here, plaintiff's primary claim is that defendants failed to adequately treat his medical needs in violation of the Eighth Amendment, which prohibits "cruel and unusual punishments" caused by deliberate indifference to conditions resulting in the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although the Constitution does not mandate comfortable prisons, officials have a duty under the Eighth Amendment to provide "humane conditions of confinement" by ensuring that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

To succeed on a claim of constitutionally inadequate medical care in particular, an inmate "must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Donald v. Wexford Health Sources*, Inc., 982 F.3d 451, 458 (7th Cir. 2020) (citations and internal quotations omitted). For purposes of summary judgment, defendants have conceded that plaintiff's ongoing urological complaints presented an objectively serious medical condition. (Dkt. #31, at 13.)

As for proof of the requisite deliberate indifference, a plaintiff must prove a prison official "*actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original) (citing *Farmer*, 511 U.S. at 837); *see also Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (same). Indeed, the Seventh

10

Circuit recognizes that proof of deliberate indifference is "a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).  Thus, when a prisoner has received medical treatment for his medical condition, courts will generally defer to a medical professional's professional judgment as to the adequacy of that care *unless* a plaintiff introduces evidence of a departure from ordinary care by: "refus[ing] to take instructions from a specialist"; "fail[ing] to follow existing protocol"; "persist[ing] in a course of treatment known to be ineffective"; "choos[ing] easier and less efficacious treatment without exercising professional judgment"; or "inexplicably delay[ing] [] treatment which serves no penological interest."  *Petties*, 836 F.3d at 729-31 (internal citations and quotations omitted).

## I.  Plaintiff's CT Scan

To begin, plaintiff claims that *all* defendants violated his Eighth Amendment rights by ignoring Dr. Hoxie's initial instruction to schedule a CT scan in March 2023 in addition to the cystoscopy.  This claim fails for two reasons:  first, plaintiff has produced no evidence from which a reasonable jury could infer that (1) Dr. Ribault or any other defendant deliberately ignored or delayed *or* were indifferent to plaintiff's need for a CT scan; and (2) even if Dr. Ribault or another defendant unreasonably delayed ordering a CT scan, plaintiff has produced no evidence from which a reasoanble jury could infer that this delay exacerbated his condition or unnecessarily prolonged his pain.

As to Dr. Ribault's decision not to order a CT scan for plaintiff in March 2023,

11

nothing from Dr. Hoxie's notes indicated that a CT scan was necessary before scheduling plaintiff's cystoscopy. Rather, Hoxie specifically wrote, "I am going to obtain a CT scan with and without IV contrast *due to microscopic hematuria*," dkt. #33-1, at 96 (emphasis added), which Dr. Ribault understood to mean a CT scan was being ordered because plaintiff *reported* microscopic hematuria. In contrast, Dr. Ribault knew that the only urinalysis to show microscopic hematuria was in October 2022, almost six months before Dr. Hoxie noted the need for a CT scan before plaintiff's cystoscopy. Plus, the three urinalysis tests taken by plaintiff since then had come back normal. Because the stated reason for Dr. Hoxie's proposed plan of care was contradicted by plaintiff's medical records, therefore, a reasoanble jury could find at most that Dr. Ribault reasonably, although mistakenly, believed that a CT scan was unnecessary and did not order one until later, after the off-site provider explained the need for one. Such a mistake, without more, might have been negligent but is *not* evidence of deliberate indifference. *Whiting*, 839 F.3d at 662; *see also Estelle*, 429 U.S. at 105-06 ("an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'").

In opposition, plaintiff nevertheless argues that the evidence shows Dr. Hoxie needed the CT scan as a prerequisite to the cystoscopy because it was less surgically intrusive and risky. However, plaintiff identifies no language in Dr. Hoxie's March 2023 notes showing that the CT scan served any purpose beyond his reported microscopic hematuria. If anything, the record indicates that had Dr. Ribault known the CT scan was a prerequisite for plaintiff's cystoscopy, Ribault would have ordered it, just as he did when

12

the need for one was explicitly communicated by an off-site provider in May 2023. Additionally, plaintiff has provided *no* evidence that ordering a cystoscopy without a prior CT scan falls outside the parameters of the exercise of professional discretion. Accordingly, no reasonable jury could infer that Dr. Ribault was deliberately indifferent to plaintiff's medical needs when he did not schedule the CT scan in March 2023.

Likewise, even if Dr. Hoxie's March 2023 notes could be interpreted as requiring a CT scan as a prerequisite to plaintiff's cystoscopy, no reasonable jury could find that Dr. Ribault's delay in ordering a CT scan rose to a constitutional violation. To succeed on a constitutional claim for a delay in medical treatment, an inmate must place "*verifying medical evidence* in the record to establish [its] detrimental effect." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). Again, plaintiff has produced *no* evidence that the delay had any detrimental effect or that benign cysts discovered on imaging were caused by any treatment plaintiff failed to receive. To the contrary, despite plaintiff's continued pain, the record shows that (1) after October 2022, his labs and images were consistently normal, and (2) any potential diagnosis required exclusion, which only more time could resolve. Accordingly, no jury could conclude that delay caused by Dr. Ribault rose to the level of a constitutional violation and for this additional reason he is entitled to summary judgment as a matter of law.

As for defendants Parr, Lee, Wehrle, and Martin, plaintiff contends that they each knew through various means that Dr. Hoxie requested a CT scan in March 2023, and that it needed to be done before the cystoscopy but did not schedule it or adequately explain this need to Dr. Ribault. However, none of these defendants are ACPs, authorized to

13

determine a course of treatment or override the treatment decisions of an ACP, to whom they *must* defer.  Thus, each of these defendants were entitled to rely on Dr. Ribault's treatment decisions.  *See McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 887 (7th Cir. 2018) (affirming summary judgment for nurse who deferred to doctor's prescription despite leading to overdose).  Accordingly, defendants Parr, Lee, Wehrle, and Martin are entitled to summary judgment as a matter of law on this claim as well.

## II.  Plaintiff's Use Of Tamsulosin

Plaintiff separately claims that Dr. Ribault violated his Eighth Amendment rights by encouraging him to take tamsulosin despite knowing that it would provide no relief. However, plaintiff concedes, as he must, that defendant Ribault communicated to Nurse Wehrle that plaintiff could stop taking tamsulosin if he was not seeing obvious changes. (Dkt. #38, at 15.)  Further, plaintiff's own medical records reveal that *he* told Dr. Ribault that tamsulosin was *improving* some of his urinary symptoms.  (Dkt. #33-1, at 76.) Accordingly, no reasonable jury could find on that record that Dr. Ribault's encouraging plaintiff to continue taking tamsulosin even amounted to negligence, much less deliberate indifference.  As a result, Dr. Ribault is also entitled to summary judgment as a matter of law on this claim.

## III. Plaintiff's Other Prescribed Medications.

Plaintiff claims that defendants Wehrle and Ribault further violated his Eighth Amendment rights by prescribing and signing off on the use of other medications that they knew or should have known would worsen his symptoms.  In support of this contention,

14

however, plaintiff merely offers patient education instructions that he received from the HSU about dysuria, which advised against use of ibuprofen or other drugs that may act as blood thinners if a patient has blood in their urine because those medications may increase bleeding.   (Dkt. #49-2, at 3-4.)   However, when plaintiff was first prescribed acetaminophen and Motrin for pain in February 2023, the medical record shows he did not have blood in his urine.  In fact, plaintiff's *only* uranalysis containing blood was in October 2022, more than four months prior, *and* in *all* subsequent urinalysis blood was not present.   Given that plaintiff was *not* experiencing hematuria when advised to take acetaminophen and Motrin, nor any time after, no jury could conclude that defendants Wehrle or Dr. Ribault were deliberately indifferent to his medical needs when prescribing these medications.  Accordingly, these defendants are entitled to summary judgment as a matter of law on this claim.

## IV. Qualified Immunity

Alternatively, defendants have asserted the defense of qualified immunity, which protects government officials from liability for damages unless they "violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once the defense is raised, plaintiff bears the burden of defeating it by showing that: (1) the defendants violated a constitutional right; and (2) the constitutional right was clearly established at the time of the violation. *Garcia v. Posewitz*, 79 F.4th 874, 778 (7th Cir. 2023).  "If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023) (citation and internal quotation marks omitted).

15

At minimum, plaintiff has not shown that any of the named defendants in this case clearly violated his constitutional rights by failing to schedule a CT scan in response to Dr. Hoxie's initial communications nor by affirmatively prescribing tamsulosin, acetaminophen, and Motrin while continuing to search for a longer term remedy.  Because plaintiff has failed to offer any clearly established right being violated in this case, the court will grant defendants motion for summary judgment for this additional reason as well.

## V.  State Law Claims[2]

Finally, Plaintiff has pleaded medical negligence claims against defendants under Wisconsin law, which are only before this court through an exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a).  Because the court has now dismissed all of plaintiff's federal claims, and plaintiff has not alleged any other basis for the exercise of federal jurisdiction over these state-law claims, district courts are encouraged to relinquish supplemental jurisdiction absent unusual circumstances.  *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019).  Since there are no unusual circumstances that would justify retaining jurisdiction, therefore, the court declines to exercise any further jurisdiction over plaintiff's common law medical negligence claims and will dismiss those claims without prejudice so that plaintiff may pursue them in state court to the extent not time barred.

---

[2] Plaintiff was granted leave to proceed on state law medical negligence claims in a text only order that was separate from this court's screening order (dkt. #23), although, these claims were not addressed in defendants' motion for summary judgment.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #30) is GRANTED as to all of plaintiff's Eighth Amendment claims..

2) Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE under 28 U.S.C. § 1367(c)(3).

3) Defendants' motion to strike plaintiff's reply in support of his additional proposed findings of fact (dkt. #59) is GRANTED.

4) Plaintiff's motion for the court to take judicial notice of adjudicative facts (dkt. #43) is DENIED AS MOOT.

5) The Clerk of Court is directed to enter judgment consistent with this opinion and close this case.

Entered this 21st day of July 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

17